UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

LUBBER, INC.                         )
                                     )
            Plaintiff,               )
                                     )
     v.                              )        Case No. 3:11-0042
                                     )        Judge Sharp
OPTARI, LLC and JEREMIAH PENT,       )
                                     )
            Defendants.              )

## MEMORANDUM

Pending before the Court is Plaintiff Lubber, Inc.'s ("Lubber's" or "Plaintiff's")Amended

and Supplemental Motion for Leave to Amend Complaint (Docket No. 65), as well as Defendants

Optari, LLC's ("Optari's") and Jeremiah Pent's ("Pent's) (collectively "Defendants'") Motion for

Judgment on the Pleadings (Docket No. 39). Both Motions have been fully briefed by the parties

(Docket Nos. 40, 41, 47, 64, 76 & 85). For the reasons explained below, the Court will allow

Plaintiff to amend its Complaint, except to the extent that it seeks to maintain a rescission claim and

an accounting claim.

## I. FACTUAL BACKGROUND AND PROCEDURAL POSTURE

This is a case about a business deal between neighbors gone bad and what in hindsight was

trouble waiting to happen. According to the allegations in the Verified Complaint,[1] which the Court

accepts and sets forth as true for present purposes, the relevant facts are as follows:

Dennis Brazzell ("Brazzell") founded Lubber in 2007 to sell rubber tote bags ("Lubber

---

[1] The underlying factual allegations in both the Verified Complaint and the proposed First Amended
Complaint are substantially the same.

Totes") that he had invented. Brazzell expanded the business in 2009 to sell charms for those totes called "Lubbs." On March 30, 2010, Lubber registered the trademark LUBBER in the United States Patent and Trademark Office.

In August of 2009, Pent moved in next door to Brazzell, and, upon hearing about the Lubber Totes, began marketing and selling them. Eventually, Pent assumed a managerial role in connection with Lubber's marketing and sales. Pent also invested money in Lubber and pressured Brazzell to give him an ownership share in Lubber in exchange for his investment. Brazzell eventually capitulated in the repeated requests and gave Pent 49 shares of stock in Lubber.

Unsatisfied with simply being a shareholder, and wanting more control over Lubber, Pent convinced Brazzell that he would be more effective with exclusive rights to market and sell the Lubber Totes. On April 14, 2010, Brazzell and Lubber entered into an Exclusive Licensing Agreement with Pent (the "Licensing Agreement"). The Licensing Agreement did not include any provision for payment to either Lubber or Brazzell as consideration for the Licensing Agreement.

Within days of the execution of the Licensing Agreement, Pent set about to misappropriate the Lubber business in its entirety. When Brazzell objected to Pent's actions, Pent threatened to take Lubber's customers and sell competing products under Optari, his company's name.

In addition to attempting to wrest control of the business, Pent and Optari, diverted funds from Lubber's account for their personal use and benefit. With the Lubber accounts drained and few resources left to show for his invention, Brazzell and his wife, Suzanne Brazzell ("Mrs. Brazzell") entered into a Separation, Redemption and General Release Agreement ("Separation Agreement") with Pent and Optari.

The Separation Agreement recites that it was entered into because "disputes have arisen

2

among Brazzell, Lubber, Pent and Optari with respect to, among other things, the Licensing

Agreement and certain matters in connection therewith and with manufacture, marketing and sale

of products." (Docket No. 1-3 at 1). The Separation Agreement also indicated that "Pent and

Brazzell desire to terminate Pent's association with Lubber, including the licensing agreement, and

desire that Lubber redeem Pent's Forty-Nine Percent (49%) interest in Lubber" and that "the Parties

desire to terminate their relationships in the manner specified herein and wish to resolve amicably

any and all outstanding differences between them." Id.

Towards that end, Defendants terminated the Licensing Agreement, redeemed Pent's stock

in Lubber, paid $100,000, and secured the right to continuing selling similar products to those sold

by Lubber, and to sell Optari's existing inventory of Lubber products. In exchange, Lubber and

Brazzell agreed to release claims against Defendants as follows:

> Lubber and Brazzell . . . shall hereby fully, forever, irrevocably, and unconditionally
> release, remise and discharge Pent and Optari . . . from all actions, causes of action,
> suits, debts, loans, dues, sums of money, accounts, reckonings, bonds, bills,
> specialties, covenants, contracts, controversies, agreements, promises, variances,
> trespasses, damages (including, compensatory, punitive and liquidated damages),
> judgments, extents, executions, claims, and demands, whatsoever, in law, admiralty
> or equity, known or unknown, fixed or contingent, which against any of Pent
> Releasees, or any person or entity on whose behalf they are acting, the Lubber
> Releasors ever had, now have or hereafter can, shall or may have, for, upon, or by
> reason of any matter, cause or thing whatsoever from the beginning of the world to
> the Closing Date. This general release includes known and unknown claims and
> asserted and unasserted claims, including, without limitation, all claims relating to
> Pent's separation from Lubber, the complete redemption of Pent's shares in Lubber,
> the Licensing Agreement and including, without limitation, all common law and
> statutory claims, breach of fiduciary duty claims, actions in defamation and breach
> of contract, and any claim or damage arising out of Pent's and Optari's performance
> of services to or for Lubber and/or Brazzell, and his past ownership in Lubber.

(Docket No. 1-3 at 6).

The Separation Agreement was not the elixir Lubber envisioned. According to Lubber, since

3

the execution of the Separation Agreement, Defendants have engaged in a campaign to confuse and mislead consumers into believing Optari and Lubber are one and the same, that Optari's new totes are the "new and improved" version of the Lubber Tote, and that the original Lubber Tote is no longer available. Additionally, customers have been duped into paying Pent for Lubber products, but Pent has kept those payments for his and/or Optari's benefit.

On January 12, 2011, Lubber filed a Verified Complaint and an Application for Preliminary Injunction in this Court. In the Verified Complaint, Lubber asserted claims against Optari and Pent seeking damages for breach of the Separation Agreement, rescission based on material breach of the Separation Agreement and Defendants' unlawful conduct, violations of the federal Lanham Act (including unfair competition and trademark infringement), common-law unfair competition and trademark infringement, violations of the Tennessee Consumer Protection Act ("TCPA"), intentional interference with contract and business relations, conversion, and specific performance.

Two days after filing the Verified Complaint, Lubber filed an "Emergency Motion for Temporary Restraining Order," seeking (among other things) to preclude Defendants from exhibiting their product at an Atlanta trade show. Lubber requested that the restraining order be issued without bond because the parties in the Separation Agreement agreed that the non-breaching party was entitled to seek equitable and injunctive relief to prevent breaches or threatened breaches of the agreement between the parties and was also entitled to specifically enforce the Separation Agreement. That same day, Judge Trauger entered a Temporary Restraining Order which prohibited Defendants from exhibiting certain specified products at the trade show, and prohibited them from using Lubber's trademark or logo, or suggesting that Lubber was affiliated with Defendants and/or had been purchased by Defendants. (Docket No. 12).

4

After filing an Answer, Defendants filed a Motion for Judgment on the Pleadings. The Motion was directed primarily at Lubber's rescission claim, but Defendants included, as an alternative request that Brazzell and his wife be ordered joined as indispensable parties to the rescission claim because they were signatories on the Separation Agreement.

Lubber's filed a response in opposition to the Motion for Judgment on the Pleadings, as well as a Motion for Leave to Amend Complaint to add the Brazzells as Plaintiffs to the rescission claim and to add a claim for false patent marking under 35 U.S.C. § 292. Thereafter, Lubbers filed the presently pending Amended and Supplemental Motion for Leave to Amend Complaint, noting that the Brazzells are legally separated, that Mrs. Brazzell had assigned her interests in the Separation Agreement and this lawsuit to her husband, and she had no interest in pursuing this litigation or any rights she had under the Separation Agreement.

The proposed First Amended Complaint retains all of the claims set forth in the original Verified Complaint. However, in the proposed First Amended Complaint, Brazzell is added as a Plaintiff to the rescission claim set forth in Count III, and a new Count XIII is added for false patent marketing under 35 U.S.C. § 292. Further, the proposed First Amended Complaint eliminates the reference in some of the counts to LUBBS being a federally registered trademark of Lubber.

## II. APPLICATION OF LAW

As noted at the outset, pending before the Court are Plaintiff's Amended and Supplemental Motion for Leave to Amend Complaint and Defendant's Motion for Judgment on the Pleadings. The Court first considers the Motion to Amend because its ruling on that Motion renders moot most of the Defendants' Motion for Judgment on the Pleadings.

## A. **Amended and Supplemental Motion for Leave to Amend Complaint**

Under Rule 15(a) of the Federal Rules of Civil Procedure, when a party moves to amend a complaint after an answer has been filed, "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). In determining whether leave should be given, the Sixth Circuit has indicated that a court should consider the following factors: "the delay in filing, the lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment." Perkins v. Am. Elec. Power Fuel Supply, Inc., 246 F.3d 593, 605 (6th Cir. 2001).

In their brief in opposition to the Amended and Supplemental Motion for Leave to Amend Complaint, Defendants claim that Plaintiff's request to amend is futile as it relates to the rescission claim, and the false patent marking claim.[2]

### **(1) Rescission Claim**

"Generally speaking, rescission is appropriate when a party has been induced to enter into a contract by fraud, duress or undue influence." B.L. Hodge Co. v. Roxco, Ltd., 1997 WL 644960 at *3 (Tenn. Ct. App. Oct. 16, 1997). Even though rescission of a contract is a potential remedy for unwinding contracts brought about by fraud or duress, it "is not looked upon lightly and is only available under the most demanding circumstances and depends upon the individual facts and circumstances of each case." Cato v. Batts, 2011 WL 579153 at *9 (Tenn. Ct. App. Feb. 17, 2011).

---

[2] Defendants also claim the request to amend is brought in bad faith, arguing that there have been "recent statements made by Plaintiff that raise serious questions about Plaintiff's motives in bringing the amendment and its lack of truthfulness with its own attorneys," and that Plaintiff has taken inconsistent positions as between its Verified Complaint and its Answer to Defendants' Counterclaim. Much of what Defendant relies upon to show bad faith is far outside the pleadings. Regardless, the Court does not reach the bad faith issue because it finds that amendment would be futile in relation to the rescission claim.

Thus, "rescission is not enforceable as a matter of right but is a matter resting in the sound discretion of the trial court and the court should exercise the discretion sparingly." Klosterman Develop. Corp. v. Outlaw Aircraft Sales, Inc., 102 S.W.3d 621, 631 (Tenn. Ct. App. 2002).

In this case, Defendants argue that Plaintiff has unequivocally affirmed the Separation Agreement, the Separation Agreement cannot be unwound, Brazzell is a bankruptcy debtor who lacks standing, and Mrs. Brazzell is a necessary and indispensable party who cannot be joined against her will. The Court finds some merit to each of these arguments, and the first two arguments dispositive on the issue of futility.

To begin with, Brazzell is an essential party because he signed the Separation Agreement, but he lacks standing to bring a rescission claim because he filed for bankruptcy a little over a month after the execution of the agreement, and the bankruptcy is ongoing.[3] In Schedule B of his Voluntary Petition under Chapter 7 of the Bankruptcy Code, Brazzell identifies a 50% ownership in Lubber, Inc. as a part of his personal property. (Docket No. 39-1 at 13).

"Under § 541 of the Bankruptcy Code, all of a debtor's property, including legal claims, become part of the bankruptcy estate at the time the petition is filed." Matthews v. Potter, 316 Fed. Appx. 518, 519 (7th Cir. 2009). "The trustee may abandon a legal claim, but until then only the trustee, as the real party in interest, has standing to sue." Id.; see also, In re C.W. Mining Co., 636

---

[3] While the request for leave to amend was under active consideration by the Court, Plaintiff was granted leave to file certain records from the bankruptcy court. Among other things, those records indicate that Brazzell amended his bankruptcy statements and schedules to assert an interest in this litigation. Those records also reflect that the bankruptcy trustee filed a report of no distribution which, Plaintiff submits, "signaled her intention to abandon to Brazzell any interest in this litigation held by the bankruptcy estate." (Docket No. 90 at 2). This may be true, but, as Plaintiff concedes, "[a] trustee's filing of a report of no distribution is preparatory to the closing of a bankruptcy case," id. at 3, and the bankruptcy estate apparently has not been formally closed as of this writing.

F.3d 1257, 1262 (10th Cir. 2011) ("the Bankruptcy Code vests the right to litigate on behalf of the estate in the trustee, see 11 U.S.C. § 323, and includes an estate's legal claims as part of the estate's property").

Lubber admits that Brazzell filed a Chapter 7 Petition and that property of the bankruptcy estate includes causes of action. He points out, however, that rescission is an equitable remedy, and some cases hold that equitable claims can be pursued by the debtor.

Simply labeling the claim as sounding in equity does end the inquiry because the essential question is whether the claim is of little or no value to the estate. See, Matthews, 316 Fed. Appx. at 523-24 (collecting cases) (debtor could pursue claim for reinstatement because "claim was of no value to her bankruptcy estate"). This is because "[t]he trustee's paramount duty' in Chapter 7 is to marshal the estate's assets for a *pro rata* distribution to all creditors," In re Teknek, LLC, 563 F.3d 638, 650 (7th Cir. 2009), and "[t]he trustee and the creditors are interested in the debtor's property that can add anything of value to the estate." Burnes v. Pemco Aeroplex, Inc., 291 F.3d 1282, 1289 (11th Cir. 2002). Thus, not surprisingly, in the cases relied upon by Lubber, the court in Sherrell v. WIL-BFK Food Serv's, 2009 WL 3378991 at *2 (W.D. Mo. Oct. 19, 2009) held that the debtor could pursue her claim for reinstatement and promotion – but not damages – in a Family Medical and Leave Act case, and the debtor in E.E.O.C. v. Merchants State Bank, 554 F.Supp.2d 959, 962 (D.S.D. 2008) could pursue his claim for injunctive relief and reinstatement under the Americans With Disabilities Act.

The request for recision in this case is markedly different. If rescission were to be ordered, and the parties were to be placed in the position of *status quo ante*, Pent would be entitled to a 49% interest in Lubber, and Defendants jointly would be entitled to return of the $100,000 settlement

8

payment. Obviously this could impact the bankruptcy estate, and whether it is a claim which should be pursued is a decision for the bankruptcy trustee, not Lubber or Brazzell to make.

Plaintiff argues that even if the trustee is the real party in interest for purposes of this claim, dismissal would be premature because, under Rule 17(a), "[t]he court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." Fed. R. Civ. P. 17(a)(3). While that may be so, another indispensable party is missing from the proposed First Amended Complaint – Mrs. Brazzell, who was also a signatory to the Settlement Agreement.

In an effort to excuse her absence from this lawsuit, Lubber points to a "Stock Transfer, Assignment and Ratification Agreement" ("Transfer Agreement"), which the Brazzells signed in mid-August 2011. In the Transfer Agreement, Mrs. Brazzell purports to assign to her husband her rights in this litigation, and appoints him to prosecute the action on her behalf. As for the Settlement Agreement, Mrs. Brazzell purports to "assign[] to Husband all assignable rights and obligations under the [Separation Agreement] between Lubber, Inc., Husband and Wife, on one hand, and Jeremiah Pent and Optari, LLC, on the other hand, including, without limitation, all claims arising thereunder, and Husband shall be responsible for all claims arising against Wife under said agreement." (Docket No. 65-20 at 2).

Contrary to Lubber's assertion, it is not entirely clear that Mrs. Brazzell "assigned her right to pursue the rescission cause of action to Dennis Brazzell" (Docket No. 65 at 2), notwithstanding the general assignment language. The Transfer Agreement does not mention rescission, and, when it does mention the Separation Agreement, it does so in the context of "assignable rights and obligation," and "all claims arising thereunder." A claim for rescission is the opposite of agreeing

9

to allow one to pursue his or her right and obligations under a contract.

True, this problem, like the absence of the trustee, is not necessarily fatal because Lubber has indicated that it does not oppose the joinder of Mrs. Brazzell if required. However, even assuming Plaintiff fixed the indispensable party problem, there are two fundamental substantive defects with the rescission claim which would make amendment futile.

First, Lubber presents no argument that the Separation Agreement can be effectively unwound. However, "'[u]pon rescission of a contract, the parties must be placed only in substantially the same condition as they were when the contract was executed, or as near thereto as possible[.]'" GuestHouse Intern., LLC v. Shoney's North Am. Corp., 330 S.W.3d 166, 207 (Tenn. Ct. App. 2010) (citation omitted). "If the parties cannot be put in status quo, or if, due to the passage of time or other reasons, equity cannot be done, there is no ground for rescission." Lamons v. Chamberlain, 909 S.W.2d 795, 801 (Tenn. Ct. App. 1998).

Assuming that the Trustee was to come on board or relinquish the rescission claim, assuming that Mrs. Brazzell is not indispensable, and assuming that Brazzell had the wherewithal to pony up $100,000 and return the 49 shares to Pent, Plaintiff does not explain how the parties can be returned to the pre-Separation Agreement status quo, arguing only that "a question of facts exist as to whether unwinding the agreement would be equitable here." (Docket No. 41 at 15).

In the Courts view, Lubber's own allegations indicate the Separation Agreement cannot be unwound. Lubber admits that since the Separation Agreement (which is now more than a year old), the parties have been "direct competitors" (id. at 9), and a fair reading of the Verified Complaint suggests that Defendants are actively marketing their wares, and perhaps Lubber's as well. Forgetting that, under the pre-Separation Agreement scheme of things, Pent had the exclusive license

to market Lubber products – meaning that Lubber would not be entitled to sell its own products were the Separation Agreement unwound – the fact that there are ongoing separate businesses counsels against rescission as a viable remedy. See, Stonecipher v. Estate of Gray, 2001 WL 468673 at *7 (Tenn. Ct. App. 2001) (rescission not appropriate where business had operated for over a year, had increased in value and had changing inventory); Lamons, 909 S.W.2d at 801 (rescission inappropriate where plaintiff operated business for eighteen months and had reinvested money into the business).

Moreover, Lubber's own arguments suggest that rescission is not feasible. In this regard, Lubber asserts "the parties' circumstances are complicated," and that "[r]eturning the parties to the pre-separation period, at a point when they vehemently disputed whether they were still contractually affiliated under the April 2010 licensing agreement, would not be an equitable result, particularly where Defendants unlawfully exploited that relationship both before and after the execution of the Separation Agreement." (Docket No. 41 at 14).

Additionally, in arguing that a material breach can form the basis for a rescission claim, Lubber writes:

> Plaintiff has alleged that Defendants, in bad faith, have violated the essence of the expressly titled "*Separation* Agreement" by representing to the public that the parties were still affiliated. Given the parties' history as business partners, the dispute that led to the Separation Agreement — control over and association with the Lubber product — and the post-Separation Agreement status of the parties as direct competitors, the separation terms comprised the heart of Plaintiff's expected benefits under the agreement. Plaintiff has alleged that Defendants have substantially and fundamentally breached these essential provisions by continuing to represent and hold themselves out as agents and representatives of Lubber and by continuing to represent themselves as associated with Lubber and Lubber's products.

(Id. at 9, bold in original). While Lubber contends the foregoing supports the position that it "has

pled facts sufficient to state a rescission claim," (Id. at 14), those same argument also lends further support to the conclusion that rescission is inappropriate. This is because "if an adequate remedy of law exists, such as an award of damages, rescission will not be granted." Healthcare Mgmt Resources, LLC v. Carter, 2007 WL 173907 at *7 (Tenn. Ct. App. Jan. 23, 2007); accord, Stonecipher, 2001 WL 4688673 at *5.

Second, Lubber's rescission claim fails as a matter of law because it has ratified the Separation Agreement and elected to continue operating under it. "Courts have long held that the right to rescind a contract for fraud must exercise immediately upon its discovery, and any delay in doing so, and continued employment, use and occupancy of property received under a contract will be deemed an election to confirm it." Cashia v. Hancock, 2002 WL 1466058 at *11 (Tenn. Ct. App. July 9, 2002). "In other words, 'a failure to rescind with reasonable promptitude amounts to affirmation of the contract.'" Prince Revocable Trust v. Blackwell, 737 F.Supp.2d 804, 812-813 (M.D. Tenn. 2010) (citation omitted). "That rule has been consistently applied by the courts of this state." Third Nat'l Bank v. Culbreath, 1992 WL 40193 at *2 (Tenn. Ct. App. 1992) (collecting cases).

Lubber is correct that a plaintiff may assert alternative theories for recovery, but "[a]ny conscious recognition of the contract as binding with knowledge of the fraud bars the right of rescission.'" Ingram v. Beazer Homes Corp., 2003 WL 1487251 at *6 (Tenn. Ct. App. 2003) (citation omitted). "'Thus, a party, after having filed a suit for rescission, may by his subsequent actions inconsistent with his prayer for rescission, thereby affirm the voidable transaction and bar himself from his pending claim for rescission.'" Id.

In this case, Lubber has done more than merely assert alternative causes of action. Lubber

12

has affirmatively taken actions in accordance with the Separation Agreement which are inconsistent with its request for rescission. Lubber has been marketing and selling Lubber totes, something it was not entitled to do pre-Separation Agreement because Pent had the exclusive license to market and sell that merchandise. According to the Verified Complaint and a letter attached thereto, Lubber also requested records from Defendants, a request which was made specifically under "paragraph 12 of the Separation, Redemption and General Release Agreement." (Docket No. 1-4 at 1). Lubber also sought and obtained a Temporary Restraining Order restricting Defendants' use of Lubber products and intellectual property at a trade show, a request which was based on the "breach or threatened breach of that separation agreement," and the alleged violation of Plaintiff's rights under "a separation agreement executed by the parties." (Docket No. 12 at 1-2). Lubber also entered into an Agreed Order which (1) restricted Defendants use of Lubber's products and intellectual property (even though, without the Separation Agreement Defendants would have possessed that right) and (2) allowed Defendants to "use the Lubber Marks only as necessary to sell off the remaining Lubber inventory . . . as specified in the parties' Separation Agreement[.]" (Docket No. 28 at 2). After the Agreed Order, Optari allegedly used the LUBBER mark in its website metatags, prompting Lubber to demand that Defendants comply with the Agreed Order, which they did. (Docket No. 42-1 at 15 ¶ 55). If these actions by Lubber do not amount to a "conscious recognition of the contract as binding" and "actions inconsistent with [its] prayer for rescission," Ingram, 2003 WL 1487251 at *6, the Court is at a loss to understand what would constitute such action.

In light of foregoing, the Court concludes that it would be futile to allow Lubber to continue with a rescission claim. Thus, while the Court will allow the First Amended Complaint to be filed, it will dismiss the rescission claim as set forth in Count III.

13

### (2) False Patent Marking Claim

Defendants next argue that allowing Lubber to amend it complaint to include a false patent marking claim under 35 U.S.C. § 292 would be futile because the statute is unconstitutional. Defendants also argue that Lubber fails to state a claim under that statute.

Some courts have held that the *qui tam* provision of the false marking statute violates the Take Care Clause of Article II of the United States Constitution.[4] For example, in <u>Unique Prod. Solution, Ltd. v. Hy-Grade Valve, Inc.</u>,765 F.Supp.2d 997, 1005 (N.D. Ohio Mar. 14, 2011), the court held that whether the statute is deemed civil, criminal, or a civil-criminal hybrid, its *qui tam* provision is unconstitutional because the "statute lacks any of the statutory controls necessary to pass Article II Take Care Clause muster," and "essentially represents a wholesale delegation of criminal law enforcement power to private entities with no control exercised by the Department of Justice." <u>See also</u>, <u>Unique Prod. Solution, Ltd. v. Hy-Grade Valve, Inc.</u>, 2011 WL 924341 (N.D. Ohio Mar. 14, 2011) (on motion for reconsideration). However, "[s]ince <u>Unique Product</u> was decided, several federal district courts have held that Section 292(b) is constitutional." <u>Champion Lab. Inc. v. Parker-Hannifin, Corp.</u>, 2011 WL 1883832 at *3 (E.D. Ca. May 17, 2011) (collecting cases).

The debate about the constitutionality of the *qui tam* provision of the false marking statute is now largely academic because, on September 16, 2011, the President signed into law the Leahy-Smith America Invents Act. Among other things, the Act added a provision to Section 292(a) which states that "[o]nly the United States may sue for the [$500] penalty provided by this subsection." H.R. 1249 Sec. 16. The Act also eliminated Section 292(b)'s provision that the United States and

---

[4] The Take Care Clause provides that the President "shall take Care that the Laws be faithfully executed[.]" U.S. Const. art. II, § 3.

14

the suing party each receive one-half of any award by providing: "a person who has suffered a competitive injury as a result of a violation of this section may file a civil action in a district court of the United States for recovery of damages adequate to compensate for the injury." Id. Finally, the Act provides that "[t]he amendments made by this subsection shall apply to all cases, without exception, that are pending on, or commenced on or after, the date of enactment of this Act." Id. In accordance with the law as it now stands, Plaintiff can pursue a claim under the false marking statute.

In addition to their unconstitutionality argument, Defendants assert that Lubber false marking claim fails to state a claim because Defendants have filed a request for a patent and are therefore entitled to display the mark "patent pending" on their products. In response, Lubber argues that Defendants are selling Sol Totes with a "patent pending" label on the bottom of the tote next to the Optari label, and doing so with the knowledge that no patent is pending for the Sol Tote. Rather, Optari has submitted a patent application for the straps on their Sol Totes. Because the "patent pending" mark is nowhere near the strap, this leaves the impression that a patent is pending for the tote *in toto*. (Docket No. 65-2 at 15 ¶¶ 58-59).

The crux of Defendants' futility argument is that, in bringing a false marking claim, Plaintiff "attempts to graft onto the statute" a requirement about where the "patent pending" marking must be placed. In support of this position, Defendants rely on a law review article in which the author opines that, under Section 292(a), "a potential patentee is free to place the term 'patent pending' wherever she chooses." Bonnie Grant, DEFICIENCIES AND PROPOSED RECOMMENDATION TO THE FALSE MARKETING STATUTE, 12 J. Intell. Prop. Law. 283, 288 (2004).

The relevant language of the statute (unchanged by the America Invents Act) provides for

15

liability against "whoever marks upon, or affixes to, or uses in advertising in connection with any article, the words 'patent applied for,' 'patent pending,' or any word importing that an application for patent has been made, when no application for patent has been made, or if made, is not pending, for the purpose of deceiving the public[.]" 35 U.S.C. § 292(a). "The two elements of a false marking claim are (1) marking an unpatented article and (2) intent to deceive the public." Forest Group, Inc. v. Bon Tool Co., 590 F.3d 1295, 1300 (Fed. Cir. 2009) "'Intent to deceive is a state of mind arising when a party acts with sufficient knowledge that what it is saying is not so and consequently that the recipient of its saying will be misled into thinking that the statement is true.'" Id. (quoting, See, Clontech Labs. Inc. v. Invitrogen Corp., 406 F.3d 1347, 1352 (Fed. Cir.2005). "A party asserting false marking must show by a preponderance of the evidence that the accused party did not have a reasonable belief that the articles were properly marked." Id.

In this case, Lubber states a plausible false marking claim. The allegation are that Defendants strategically placed the "patent pending" mark on the bottom of the Sol Tote in an effort to lead the public into believing that the Sol Tote itself was undergoing patent review, when, in fact, the only thing under consideration were the hand straps on the totes. Cf. Clontech, 406 F.3d at 1352 ("[I]n order to determine if an article is 'unpatented' for purposes of section 292, it must be first determined whether the claims of a patent cover the article in question. To make that determination, the claim in question must be interpreted to ascertain its correct scope, and then it must be ascertained if the claim reads on the article in question"). Accordingly, Plaintiff will be allowed to maintain its false patent marking claim as set forth in Count XIII of the First Amended Complaint.

**B. Motion for Judgment on the Pleadings**

With the conclusion that Lubber is entitled to amend its complaint (albeit without a rescission

claim), the Court could simply deem Defendants' Motion for Judgment on the Pleadings moot. See, Mata-Cuellar v. Tennessee, 2010 WL 3122635 at *2 (M.D. Tenn. Aug. 6, 2010) (" It is well-settled that, because a properly filed amended complaint supersedes and replaces all previous complaints, the filing of an amended complaint generally moots a pending motion to dismiss"). However, where an amended complaint contains allegations which are substantially similar to those in the earlier complaint, the Court can consider a pending motion to dismiss or for judgment on the pleadings. Johnson v. Gannon, 2010 WL 1658616 at *1 n.1 (M.D. Tenn. Apr. 23, 2010). It seems prudent at this point to address the additional arguments Defendants raise in their Motion for Judgment on the Pleadings because those same arguments will undoubtedly resurface in the context of another dismissal motion directed at the controlling First Amended Complaint.

### (1) Conversion Claim

Defendants assert that Lubber's claim for conversion as set forth in Count X fails because it is barred by the Separation Agreement. Although the Separation Agreement is written in broad terms, the Court finds that Count X states a plausible claim because it is not limited to the time period before the Separation Agreement as required by that agreement. In fact, the allegations in Verified Complaint suggests that Defendants may have intercepted Lubber's funds on several occasions and that, in late December 2010, Brazzell was contacted by a customer in England about an outstanding invoice who informed Brazzell that he had paid the amount due and owing to Pent but Pent never paid that money to Lubber. (Docket No. 1 at 12 ¶ 48).

### (2) Accounting Claim

Defendants also argue that the accounting claim set forth in Count XII fails because it, too, is barred by Separation Agreement. They point to paragraph 9 which, in relevant part, provides:

17

D. Brazzell, S. Brazzell and Lubber each expressly waive access to all Information [defined in the Separation Agreement as all information concerning Lubber that may be material to the subject matter hereof], and the opportunity to make inquiries regarding such Information, and to make such further inquiries as they and their advisors deem appropriate, including, without limitation, as may concern the value of the Transferred Interests and transactions occurring under or with respect to the Licensing Agreement.

(Doc. No. 1-3 at 9). Lubber's response is that its request for accounting is made pursuant to

paragraph 12 of the Separation Agreement which provides:

Pent and Optari shall retain for up to one (1) year and provide to Lubber, within ten (10) days of the date requested by Lubber in writing, but only to the extent in the possession of either of them, such financial records of Lubber, Inc. transactions as are necessary for Lubber, Inc. to prepare and file tax returns for the calendar year ending December 31, 2010 and to respond to any inquiry by the Internal Service with respect to Lubber, Inc.

(Id. at 11).

Although Lubber is entitled to receive its own financial records from Defendants for purposes

of filing its tax returns in accordance with the foregoing paragraph of the Separation Agreement,

neither the Verified or the First Amended Complaint sets forth an claim for accounting as that cause

of action is understood in the law. "An accounting is an equitable remedy which allows the court

to determine the extent of a misallocation of expenses and the damages resulting therefrom when

there is fiduciary relationship between the parties." Law v. Bioheart, Inc., 2009 WL 693149 at *16

(W.D. Tenn. Mar. 13, 2009) (collecting authorities). As the Sixth Circuit has stated:

An accounting is a species of disclosure, predicated upon the legal inability of a plaintiff to determine how much, if any, money is due him from another. It is an extraordinary remedy, and like other equitable remedies, is available only when legal remedies are inadequate.

Bradshaw v. Thompson, 454 F.2d 75, 79 (6th Cir. 1972); see, In re Del-Met Corp., 322 B.R. 781, 836

(Bktrcy M.D. Tenn. 2005) (citation omitted) ("'The true accounting remedy yields a restitutionary

18

award of the defendant's profits wrongfully obtained from use of the plaintiff's property.'").

Here, Lubber does not seek records which would show that it has been damaged by Defendant's actions, or from which it could determine how much it is due in the form of restitution from Defendants. Rather, its request is for its own records for tax purposes. If anything, the alleged failure of Defendants to provide those records amounts to a breach of contract (an available legal remedy). The failure to provide those records does not state a cause of action for accounting.

### (3) Attorney's Fees

In both their Motion for Judgment on the Pleadings and in their filings in opposition to Plaintiff's Motion to Amend, Defendants assert that they are entitled to an award of attorney's fees. Obviously, a request for an award of attorney's fees does not go to the issue of whether amending the complaint would be futile, or whether the proposed amend complaint states a plausible claim for relief. Moreover, Defendants' request for attorney's fees does not comply with the requirement of this Court's local rules. See, L.R. 54.01(b)(3). That said, and to stave off yet another motion in this highly litigious case, the Court will deny the present request for attorney's fees.

Defendants claim they are entitled to attorney's fees under the Separation Agreement, but who did, or did not do, what is an open question at this point. Further, while Defendants claim they are entitled to attorney's fees under Separation Agreement because Plaintiff set forth claims for conversion and accounting, the Court has determined that the conversion claim will go forward, and that Plaintiff is entitled to certain records under paragraph 12 of the Separation Agreement, even if they improperly characterized the claim as one for accounting.

Defendants also claim they are entitled to attorney fees under the Lanham Act and the TCPA because Counts in IV-VIII of the Verified Complaint contained allegations which relate to the

LUBBS trademark.[5] Defendants assert Mrs. Brazzell – not Lubber – is the federal registrant of that trademark, and, therefore, Lubber had no standing to advance allegations in relation to the LUBBS trademark.

Under the Lanham Act, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). The decision whether to grant or deny attorney's fees is a matter of discretion for the trial court. Eagles Ltd. v. American Eagle Foundation, 356 F.3d 724, 728 (6th Cir. 2004).

This is not an exceptional case and the Defendants are not a prevailing party even in relation to Counts IV-VIII. Those Counts remain pending because they also contain allegations about misuse of the LUBBER mark.

As for Defendants request for attorney's fees under the TCPA, the statute provides that "[i]n any private action commenced under this section, upon finding that the action is frivolous, without legal or factual merit, or brought for the purpose of harassment, the court may require the person instituting the action to indemnify the defendant for any damages incurred, including reasonable attorney's fees and costs." Tenn. Code Ann. § 47-18-109(e)(2). "'As the language of the statute makes clear, even where this prerequisite is met, whether or not to award fees is discretionary with the court.'" Jordan v. Clifford, 2010 WL 2075871 at *6 (Tenn. Ct. App. May 25, 2010).

The TCPA "action" is not frivolous or without merit because, again, the Counts which previously contained allegations about the LUBBS trademark remain pending. In any event, the Court exercises its discretion by finding that the Defendants are not entitled to an award of attorney's

---

[5] The allegations involving the LUBBS trademark are dropped in Counts IV-VIII of the First Amended Complaint, although, the "logo mark LUBBS" still appears in Count VII. Even Defendants concedes this is "apparently as a result of oversight." (Docket No. 76 at 17 n.1).

fees based upon the pleadings which have been filed in this case.

## IV. CONCLUSION

On the basis of the foregoing, the Court will enter an Order which grants Plaintiff's Amended and Supplemental Motion for Leave to Amend Complaint (Docket No. 65), except to the extent that Plaintiff seeks to maintain a claim for rescission and for an accounting. Defendants' Motion for Judgment on the Pleadings (Docket No. 39) will be denied, except to the extent that they seek dismissal of the rescission and accounting claims. Finally, the rescission and accounting claims as pled in Counts III and XII of the First Amended Complaint will be dismissed.

KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE